**UNITED STATES of America, Appellee,**

v.

**Lorraine D. GLEASON, Appellant.**

**No. 84–1913.**

United States Court of Appeals, Eighth Circuit.

Submitted March 14, 1985.

Decided July 3, 1985.

James R. Wyrsch, Kansas City, Mo., for appellant.

John R. Osgood, Asst. U.S. Atty., Kansas City, Mo., for appellee.

Before JOHN R. GIBSON, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and BOWMAN, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

Defendant Lorraine D. Gleason appeals from the district court's [1] judgment entered on a jury verdict convicting her on one count of conspiracy to defraud the United States by obstructing the Department of Treasury in collection of income taxes in violation of 18 U.S.C. § 371, and two counts of aiding in the preparation of fraudulent income tax returns in violation of 26 U.S.C. § 7206(2) [2]. On July 6, 1984, the district court sentenced Gleason to two years imprisonment on the conspiracy count, with all but six months suspended, and three years probation to begin upon her release from custody, plus a $1,000 fine. On the remaining two counts, the court sentenced Gleason to three years probation on each count, to be served concurrently with each other and with the probation sentence imposed on the conspiracy count. Gleason appeals to this court, arguing that a variance existed at trial between the conspiracy charged in the indictment and the evidence shown at trial; that the trial court impermissibly acted as an advocate at trial; that her rights to a speedy trial were violated; that the trial court erred in refusing to limit potential cross-examination of her; and that the evidence as to Count Three of

---

1. The Honorable Joseph E. Stevens, United States District Judge for the Western District of Missouri.

2. Count Two charged Gleason with aiding and abetting in the preparation of the 1980 fraudulent tax return of Orville and Diane Hart. Count Three made a similar charge as to the 1980 tax return of Nora and Charles Blankenship.

the indictment was insufficient to sustain a guilty verdict. We affirm.

## I. Facts

In 1981, Lorraine Gleason worked with her husband Michael J. Gleason at Gleason's Tax and Accounting Service, a sole proprietorship owned by Michael Gleason in Independence, Missouri. Both Michael and Lorraine Gleason were members of the Universal Life Church, as was George Leigh, who occupied a separate office in the same building as the tax service. The Universal Life Church is a non-profit, religious corporation headquartered in Modesto, California. The Universal Life Church operates through "mail order ministries," through which anyone can be ordained as a minister and have conferred upon him ministerial credentials and powers. The ministers have no required duties, nor does the church have any established creed or doctrines. The Universal Life Church also issues "mail order church charters," through which as few as three people can be designated as a congregation. The members of the congregation may be members of the same family. Once ordained, a minister may donate to the church the earnings from his regular occupation, by placing the money into his congregation's bank account. In so doing, the minister receives a charitable contributions deduction of up to 50 percent of his gross income, with a corresponding reduction in income tax liability. The minister may then withdraw money from the account, tax-free, for the upkeep of the "church" (his home), and his living expenses, including food and lodging. The "Mother Church" in Modesto requires only that the congregation file a regular report.

The evidence at trial showed that both Michael and Lorraine Gleason prepared fraudulent income tax returns for various clients for the 1980 tax year. Typically, either Michael or Lorraine Gleason, or both, would conduct a preliminary interview with taxpayers, during which the taxpayers would produce necessary information to prepare their tax returns. Then either Michael or Lorraine Gleason would inform the taxpayers that more deductions would either decrease their tax liability or increase their tax refund. The Gleasons would refer the taxpayers to George Leigh, who would sell them receipts falsely stating that the taxpayers had made contributions to the Universal Life Church during 1980. Leigh sold the receipts for a small percentage of the stated contributions.[3] Either Michael or Lorraine Gleason would prepare returns for the taxpayers reflecting these bogus contributions, and the receipts were attached to the returns. If any taxpayer expressed concern about the possibility of audits, he or she would be assured by either Michael or Lorraine Gleason or George Leigh that the Universal Life Church would corroborate the claimed contributions.

Lorraine Gleason sought to establish as a defense at trial that she played no part in the conspiracy, and that her position at the tax service was merely that of a receptionist. Gleason insisted that she had not prepared any of the fraudulent returns but merely copied over returns sloppily prepared by her husband, or signed her name as preparer when he was too busy to sign his own name. The testimony at trial, however, showed that Lorraine Gleason had informed Orville and Diane Hart how they could receive a bigger refund by purchasing phony receipts from George Leigh. Gleason also filled out the Harts' receipts, signed their return as the preparer, and told the Harts not to worry about the validity of the deductions because the receipts substantiated the claimed contributions. Further, Lorraine Gleason was present when her husband informed Nora and Charles Blankenship about the availability of the false receipts and told them to con-

---

**3.** For example, the evidence at trial showed that Dale Bedsaul received from George Leigh receipts reflecting a total 1980 contribution of $9,000 to the Universal Life Church. Bedsaul paid Leigh $160 for the receipts. Ralph Keeling obtained receipts from Leigh representing a total 1980 contribution of $12,000; Keeling paid $60 or $65 for the receipts. James Massey paid Leigh $60 for receipts reflecting a $22,000 contribution to the Universal Life Church in 1980.

tact George Leigh. She later attached the receipts that the Blankenships obtained from George Leigh to a completed tax return, which she had signed as preparer.

Lorraine Gleason pled guilty on July 27, 1983 to a one-count information charging her with aiding and assisting in the preparation of the false and fraudulent income tax return of taxpayer Ralph Keeling, in violation of 26 U.S.C. § 7206(2).[4] Gleason withdrew her guilty plea on November 23, 1983, and was indicted along with an alleged co-conspirator, J.C. Baxter, on December 9, 1983. A jury trial began on February 27, 1984, before the Honorable Scott O. Wright of the United States District Court for the Western District of Missouri. The court declared a mistrial on March 5, 1984, because the jury was unable to reach a verdict. Gleason was subsequently reindicted, and retried before Judge Stevens on May 7, 1984, resulting in the convictions from which she now appeals.

## A. Variance

Gleason first contends on appeal that the district court erred in denying her motion for a new trial, for arrest of judgment, and for judgment of acquittal based on her allegation that a variance existed between the conspiracy charged in the indictment and the evidence produced at trial. She asserts that the district court erred in admitting evidence, in the form of a co-conspirator's statements, of the "cover-up" or concealment of the fraud, because the cover-up was not within the scope of the conspiracy charged in the indictment.[5] Thus, Gleason's argument goes, the Government introduced evidence at trial as to multiple conspiracies—the initial conspiracy to defraud the United States and a second conspiracy to conceal the fraud. Gleason cites *Grunewald v. United States*, 353 U.S. 391,

77 S.Ct. 963, 1 L.Ed.2d 931 (1957), in support of her claim that the admission of the cover-up evidence caused an impermissible variance from the indictment. Because of the variance between the lone conspiracy count in the indictment and the evidence produced as to multiple conspiracies, Gleason contends her conviction should be reversed.

We hold that the cover-up evidence was properly admitted and that no variance existed here. In citing *Grunewald*, Gleason overlooks the Court's direction in that case to distinguish "between acts of concealment done in furtherance of the *main* criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime." 353 U.S. at 405, 77 S.Ct. at 974 (emphasis in original). When "[t]he successful accomplishment of the crime necessitates concealment," acts of concealment are properly considered to be within the scope of the original conspiracy. *Id.* We agree with other courts that have held that a conspiracy covered by 18 U.S.C. § 371, such as the one charged here, necessarily contemplates acts of concealment to accomplish its objectives. *See United States v. Mackey*, 571 F.2d 376, 383–84 (7th Cir. 1978); *United States v. Diez*, 515 F.2d 892, 897–98 (5th Cir.1975), *cert. denied*, 423 U.S. 1052, 96 S.Ct. 780, 46 L.Ed.2d 641 (1976). *See also Forman v. United States*, 361 U.S. 416, 423–24, 80 S.Ct. 481, 485–86, 4 L.Ed.2d 412 (1960), *overruled on other grounds, Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). As the Fifth Circuit stated in *Diez*,

[I]n the present case the central aim of the conspiracy was to deceive officials of the Internal Revenue Service, thereby inducing them to accept fraudulent tax returns as truthful and accurate. In light

4. Michael Gleason entered a plea of guilty on the same day to a charge pursuant to 26 U.S.C. § 7206(2) with respect to the 1980 income tax return of Patrick Goldsworthy.

5. The first indictment against Gleason did not specifically mention the concealment efforts.

In the trial on this indictment, which ended in a mistrial, Judge Wright did not admit the concealment evidence. When Gleason was reindicted, the superseding indictment, on which she ultimately was convicted, did refer to the concealment.

of the substantial possibility that the returns would be audited and investigated, the filing of the returns did not fully accomplish the purpose of the main conspiracy, which by its very nature, called for concealment.

515 F.2d at 897–898. Because the co-conspirators' concealment attempts were part of the original conspiracy, no variance existed and the concealment evidence was properly admitted.

## II. Alleged Misconduct of Trial Judge

Gleason next asserts that the trial court erred in denying her motions for a new trial and for a mistrial based on her allegations that the trial judge's misconduct deprived her of a fair trial. Specifically, Gleason contends that the trial judge impermissibly interjected himself into her trial by questioning witnesses, particularly Bishop Imbeau of the Universal Life Church headquarters in Modesto; calling for Bishop Imbeau to produce certain evidence; and commenting on the evidence, all to her prejudice. In support of her argument Gleason cites us to many places in the transcript that she deems examples of the judge's misconduct.

■■■ We have reviewed the transcript carefully and conclude that the trial judge did not overstep the bounds of propriety. First, we note that at least a few of the transcript pages to which Gleason refers us contain no comments by the trial judge at all, while others contain comments made by the judge out of the presence of the jury, thus averting any chance of prejudice. Other passages cited by Gleason consist of comments made by the judge to the prosecutor or defense counsel, including rulings on objections. Still other comments by the judge appear in the record as having been made in the presence, but out of the hearing, of the jury. Gleason's counsel contends that one such comment in particular, when the judge stated that a witness had been "dead wrong" in his testimony concerning the tax free benefits of ministers, was audible at the counsel table and therefore probably to the jury as well. Counsel, however, did not make a contemporaneous

objection to the comment. Had an objection been made at the time of the perceived error, the trial court would have had the opportunity to determine whether members of the jury had in fact overheard the comment. In the absence of such an objection, however, and because the record reflects that the comment was made out of the jury's hearing, we find that no plain error warranting reversal exists. *See United States v. Ellis,* 747 F.2d 1205, 1208 (8th Cir.1984).

A trial judge is more than a "mere moderator" of a trial. *United States v. Woods,* 696 F.2d 566, 570–71 (8th Cir.1982) (quoting *Dranow v. United States,* 307 F.2d 545, 572 (8th Cir.1962)).

> [The trial judge] has the prerogative, and at times the duty, of eliciting facts he deems necessary to the clear presentation of the issues. To this end he may examine witnesses who testify, so long as he preserves an attitude of impartiality and guards against giving the jury an impression that the court believes the defendant is guilty.

*Llach v. United States,* 739 F.2d 1322, 1329–30 (8th Cir.1984) (quoting *Dranow,* 307 F.2d at 572). Those questions that the trial judge did ask of witnesses were properly intended to clarify testimony and elicit necessary facts; the judge's questioning did not become so one-sided as to deprive Gleason of a fair trial. *See United States v. Bland,* 697 F.2d 262, 265 (8th Cir.1983) (when trial judge has made allegedly prejudicial comments, appeals court must use balancing process to determine whether such comments have "pervaded over-all fairness" of proceedings). In sum, the trial court did not err in denying Gleason's motions for a new trial and for a mistrial based on alleged misconduct.

## III. Alleged Violation of Speedy Trial Act

Gleason also contends that her right to a speedy trial pursuant to the Speedy Trial Act, 18 U.S.C. §§ 3161–3174 (1982), was violated in this case. For consideration of this issue we review the relevant dates

involved. Gleason originally waived indictment and pled guilty to a one-count information on July 27, 1983. The district court subsequently allowed her to withdraw her guilty plea November 23, 1983. The grand jury then handed down a nine-count indictment against Gleason and J.C. Baxter, in which Gleason was named in seven of the nine counts. Upon defense counsel's motion, the magistrate on January 9, 1984 ordered that the trial be continued from its scheduled January 23, 1984 starting date until February 27, 1984. After the case was tried, beginning on February 27, and submitted to the jury, the district court ordered a mistrial on March 5, 1984, because the jury was unable to reach a verdict. Baxter subsequently entered a guilty plea.

On March 13, 1984, the grand jury returned a new indictment against Gleason. This superseding indictment contained three counts. Count One charged a conspiracy based upon the same acts that served as the basis for the conspiracy charged in Count One of the previous indictment, but added a paragraph specifically including as part of the conspiracy actions taken to cover up the fraud. Counts Two and Three of the superseding indictment were identical to Counts Seven and Eight of the first indictment. The remaining charges in the previous indictment were dropped from the superseding indictment.

Gleason was arraigned on the new indictment on March 21, 1984, and the district court set the matter for trial on May 7, 1984. Gleason filed a motion to dismiss the case on April 25, based on alleged violations of the Speedy Trial Act, asserting that Speedy Trial computation should be governed by 18 U.S.C. § 3161(h)(6).[6] The

district court denied the motion in an order filed April 26, 1984, citing 18 U.S.C. § 3161(e), which provides 70 days for the retrial of a case that ended in a mistrial.[7] Trial on the superseding indictment began on May 7, 1984, with the jury returning its guilty verdict on May 15. The Government subsequently moved to dismiss the first indictment against Gleason.

On appeal to this court Gleason argues that the district court erred in denying her motion to dismiss based on the Speedy Trial Act. She repeats her contention that section 3161(h)(6), rather than section 3161(e), applies. Gleason claims that the superseding indictment differs greatly from the initial indictment, and that the Government benefited from the alterations because it had fewer charges to prove and more evidence (from the broadening of the conspiracy count) with which to prove them. Because under section 3161(h)(6) the 70-day time period within which she could be tried expired before May 7, 1984, the indictment should have been dismissed with prejudice under 18 U.S.C. § 3162(a)(2).

We agree with the district court that section 3161(e) applies to Gleason's case. Section 3161(e) plainly addresses the circumstance that warranted retrial in this case: the declaration of a mistrial. By its terms, section 3161(e) requires that a defendant be retried within seventy days of the declaration of a mistrial. Gleason's trial on May 7, 1984, was within seventy days of the March 5th declaration of mistrial. Gleason would have us read into section 3161(e) a condition that does not exist—namely, that a defendant must be tried on the identical indictment following a

6. 18 U.S.C. § 3161(h)(6) states:
 If the information or indictment is dismissed upon motion of the attorney for the Government and thereafter a charge is filed against the defendant for the same offense, or any offense required to be joined with that offense, any period of delay from the date the charge was dismissed to the date the time limitation would commence to run as to the subsequent charge had there been no previous

charge [shall be excluded in computing the time within which the trial of any such offense must commence].

7. 18 U.S.C. § 3161(e) states in relevant part: "If the defendant is to be tried again following a declaration of the trial judge of a mistrial * * *, the trial shall commence within seventy days from the date the action occasioning the retrial becomes final."

mistrial—and asks us to apply section 3161(h)(6).

We do not think section 3161(h)(6) can be applied without some distortion. That section expressly covers the circumstance when the Government moves to dismiss an indictment and *thereafter* a charge is filed for the same offense. Here, however, the second indictment was filed *before* the first indictment was dismissed. Thus by its terms section 3161(h)(6) does not apply to Gleason's situation. *See United States v. McCown,* 711 F.2d 1441, 1446 (9th Cir. 1983); *United States v. Horton,* 676 F.2d 1165, 1170 (7th Cir.1982), *cert. denied,* 459 U.S. 1201, 103 S.Ct. 1184, 75 L.Ed.2d 431 (1983). *C.f. United States v. Harris,* 724 F.2d 1452, 1454 (9th Cir.1984) (construing similar language in 18 U.S.C. § 3161(d)(1)). Gleason argues that the return of the second indictment in effect dismissed the first indictment against her, so that no excludable delay exists under section 3161(h)(6). She cites us to no cases, however, which hold that a superseding indictment automatically dismisses an original indictment, nor have we found any such authority. Based on a plain reading of the statute, then, we agree with the district court that section 3161(e)(6) specifically controls this situation and that Gleason's rights under the Speedy Trial Act were not violated.

## IV. District Court's Refusal to Limit Potential Cross-Examination of Gleason.

■ Gleason next assigns as error the district court's refusal to limit in advance the Government's cross-examination of her should she take the stand. When Gleason pled guilty on July 27, 1983 to the one-count information, she stated under oath that she knew the receipts attached to the tax return of Ralph Keeling were fraudu-

lent. The district court later allowed Gleason to withdraw her guilty plea. Before this case went to trial, the prosecutor indicated that if Gleason elected to take the stand, he would question her about the Keeling return. If Gleason then testified that she did not know the receipts were fraudulent when she attached them to the Keeling return, the prosecutor stated that he would be compelled to seek a perjury indictment against her for contradicting her prior sworn statement.[8] Gleason thus asked the district court to rule before trial that the Government would not be able to cross-examine her about the Keeling return. The court refused to so limit the questioning, and Gleason did not testify.

Gleason argues that the failure to restrict the potential cross-examination of her prevented her from testifying. Basically, she asserts that the court should have restricted the cross-examination for two reasons. First, the Government was able to use the threat of perjury either to prevent Gleason from testifying or to force her to waive her rights under Fed.R.Crim.P. 11(e)(6)(C). Second, if Gleason did testify but did not mention the Keeling return on direct examination, any questions about that return on cross-examination would have been outside the scope of direct and therefore inadmissible under Rule 610 of the Federal Rules of Evidence.

■ We think both of Gleason's arguments are without merit. Rule 11(e)(6)(D)(ii) of the Federal Rules of Criminal Procedure specifically contemplates the use of a statement made by a defendant in a proceeding involving a guilty plea, which is later withdrawn, in a subsequent criminal proceeding for perjury. The prosecutor's "threat" of perjury, therefore, was nothing more than a statement of intent to

8. The prosecutor would not have been able to confront Gleason with her prior statements because Rule 11(e)(6)(C) of the Federal Rules of Criminal Procedure provides that statements made by a defendant in the course of a proceeding regarding a guilty plea, which is later withdrawn, are not admissible against the defendant in any civil or criminal proceeding. Rule 11(e)(6)(D)(ii), however, allows as an exception to the general rule that such a statement is admissible "in a criminal proceeding for perjury or false statement if the statement was made by the defendant under oath, on the record, and in the presence of counsel." *See also* Rule 410 of the Federal Rules of Evidence.

do that which he had an express right to do.

Further, even if Gleason had testified without mentioning the Keeling return on direct examination, if she had represented that she did not know that any of the receipts that she had attached to returns were fraudulent, the Keeling return would relate to this testimony and could properly be addressed on cross-examination. The scope of questioning permissible on cross-examination is within the broad discretion of the district court. *United States v. Schepp*, 746 F.2d 406, 410 (8th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1190, 84 L.Ed.2d 336 (1985); *Villanueva v. Leininger*, 707 F.2d 1007, 1010 (8th Cir.1983) (per curiam). "Cross-examination may embrace any matter germane to direct examination, qualifying or destroying it, or tending to elucidate, modify, explain, contradict or rebut testimony given by the witness." *Roberts v. Hollocher*, 664 F.2d 200, 203 (8th Cir.1981). The district court did not abuse its discretion in refusing to limit the potential cross-examination of Gleason, especially when it could have expressly contradicted her testimony on direct.

## V. Sufficiency of Evidence

Gleason's final contention before us is that the district court erred in denying her motions for a new trial, for arrest of judgment, and for judgment of acquittal based on her contention that the evidence as to Count Three of the Indictment was insufficient to sustain a guilty verdict. Count Three alleges that Gleason willfully and knowingly aided and assisted in preparing a fraudulent income tax return for Charles and Nora Blankenship for the 1980 tax year. Although Gleason concedes that the Blankenships' tax return did contain fraudulent deductions, she contests the jury's finding that she acted willfully, with full knowledge of the fraudulent nature of the return. She asserts that her duties at the tax service were merely clerical, that she had no tax expertise, and that the Blankenships relied on Michael Gleason's advice in claiming the fraudulent deductions. In support of her contentions, Gleason points to the Blankenships' testimony that they had no direct conversations with her about the Universal Life Church, and to Charles Blankenship's failure to identify her in court at trial.

 In reviewing the district court's denial of a motion for judgment of acquittal, this court must consider the evidence "in the light most favorable to the government and must give the government the benefit of all reasonable inferences that may logically be drawn from the evidence." *United States v. DeLuna*, 763 F.2d 897, 924 (8th Cir.1985); *see also United States v. Anziano*, 606 F.2d 242, 244 (8th Cir.1979) (per curiam). In reviewing the evidence in the light most favorable to the Government, we conclude that the evidence as to Count Three was sufficient to sustain the jury verdict. Upon the Blankenships' initial visit to the tax service in March 1981, Lorraine Gleason conducted a preliminary interview to get information necessary to prepare their return. The Blankenships made no mention of any charitable contributions at that time. Lorraine Gleason was also present when her husband told the Blankenships that they needed a $9,000 deduction and discussed with them how they could get a receipt for a contribution from George Leigh. When Nora Blankenship later brought in a receipt obtained from Leigh representing that a $9,000 contribution had been made, Lorraine Gleason attached the receipt to a return that she had signed as the preparer, which already reflected that a $9,000 contribution had been made. That Charles Blankenship could not identify Gleason at trial is not significant in light of the fact that he met her only once in 1981, and the trial took place three years later. No question exists as to whether Lorraine Gleason was actually the woman who assisted the Blankenships on their visit to Gleason's Tax and Accounting Service. From the evidence the jury could reasonably conclude that Gleason prepared the Blankenships' return knowing that a $9,000 contribution to the Universal Life Church had not been made in 1980, and that the receipt she attached to

the return fraudulently represented that such a contribution had been made.

## VII. Conclusion

Because we find Gleason's allegations of error to be without merit, and the evidence of her guilt overwhelming, we affirm her convictions.